## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| PATRICE PERRIER, *individually and on behalf of all others similarly situated*, | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| EVOLVE BANK & TRUST, | |
| Defendant. | |

Plaintiff Patrice Perrier ("Plaintiff"), on behalf of herself and all others similarly situated ("Class Members"), brings this Class Action Complaint against Defendant Evolve Bank & Trust ("Defendant" or "Evolve"). Plaintiff alleges, based on her personal knowledge as to her own actions and her counsel's investigations, and upon information and belief as to all other matters, the following:

### NATURE OF THE CASE

1.      Financial service providers that handle sensitive, personally identifying information ("PII") owe a duty to the individuals to whom that data relates.  This duty arises based upon the parties' relationship and because it is foreseeable that exposure of PII to unauthorized persons—and especially to hackers with nefarious intentions—will result in harm to the affected individuals.

2.      The harm resulting from a data breach manifests in several ways, including identity theft and financial fraud. Exposure of a person's PII through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives.  Mitigating that risk, to the extent

it is even possible, requires individuals to devote significant time and money to closely monitor their credit and financial accounts and take additional prophylactic measures.

3. Defendant Evolve is a national "best-in-class" financial services institution offering personal banking services, business banking services, open banking, and mortgage services. Evolve "is recognized as a global leader in the payments and BaaS industry."[1]

4. Plaintiff brings this class action on behalf of herself and over 7.6 million individuals whose personal information, including names, Social Security numbers, bank account numbers, and contact information (collectively, "Private Information" or "PII"), was accessed and stolen by unauthorized third parties during a data breach of Evolve's network systems, which Evolve states occurred between February 9, 2024 and May 31, 2024 (the "Data Breach").[2]

5. In July 2024, Evolve confirmed that the Data Breach was a result of a ransomware attack carried out by the Russia-linked cybercriminal LockBit gang.

6. Evolve discovered hackers had gained access to its systems in late May 2024. After Evolve failed to pay a ransom to the LockBit gang, the cybercriminals published 33 terabytes of Plaintiff's and Class Members' compromised data on the Dark Web.

7. Even though cybercriminals breached Defendant's systems in early February 2024, Defendant claimed they only first detected suspicious activity on their systems over three months later, on May 29, 2024—after cybercriminals had spent *months* stealing consumers' PII from Defendant's unsecured database. Defendant then waited *another* 6 weeks before notifying affected individuals.

8. Therefore, cybercriminals possessed consumers' PII including Social Security numbers for nearly *five* months before Defendant notified victims of the Data Breach.

---

[1] https://www.getevolved.com/openbanking/who-we-are/ (last accessed July 11, 2024).
[2] https://www.getevolved.com/about/news/cybersecurity-incident/ (last accessed July 11, 2024).

9.      In the ordinary course of business, Defendant stored and utilized Plaintiff's and Class Members' Private Information. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. By voluntarily undertaking the collection of this sensitive Private Information, Defendant assumed a duty to use due care to protect that information.

10.      As a direct and proximate result of Evolve's inadequate data security and the inadequate training of its employees in proper data security practices, its breach of duty to handle PII with reasonable care, and its failure to maintain the security of consumers' Social Security numbers and other personal information, Plaintiff's and over seven million Class Members' PII has been accessed by hackers and exposed to an untold number of unauthorized individuals.

11.      As a result of the Data Breach, Plaintiff and Class Members suffered ascertainable losses, including but not limited to, a loss of privacy, the loss of the benefit of their bargain, out-of-pocket monetary losses and expenses, the value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminished value of their Private Information, and the substantial and imminent risk of identity theft. Given the theft of information that is largely static—like Social Security numbers—this risk will remain with Plaintiff and Class Members for the rest of their lives.

12.      Upon information and belief, Plaintiff's and Class Members' Private Information remains in Defendant's possession. Plaintiff and Class Members have a continuing interest in ensuring that information stored in Defendant's systems is and remains safe from further exploitation.

13.     Plaintiff brings this class action lawsuit on behalf of herself and those similarly situated against Defendant for its failure to adequately safeguard Plaintiff's and Class Members' Private Information, which they collected, stored and maintained on insufficiently secured systems and databases, and for failing to provide adequate notice to Plaintiff and Class Members that their information had been stolen by criminals and listed for sale on the dark web.

14.     To recover from Evolve for these harms, Plaintiff and the Class bring claims for negligence, negligence per se, breach of bailment, breach of implied contract, unjust enrichment, breach of fiduciary duty, invasion of privacy, breach of the covenant of good faith and fair dealing, and declaratory judgment. Plaintiff seeks damages in an amount to be determined at trial and injunctive relief requiring Evolve to, at minimum: 1) adopt data security practices to reasonably guard against future breaches of PII possessed by Evolve; and 2) provide, at its own expense, all impacted victims with lifetime identity theft protection services.

## PARTIES

15.     Plaintiff Patrice Perrier is a citizen of the State of Maryland, and at all times relevant to this action, resided and was domiciled in Montgomery County, Maryland.

16.     Defendant Evolve Bank & Trust is a bank, member of FDIC, and financial services organization maintaining its global headquarters and principal business office at 6000 Poplar Avenue, Suite 300, Memphis, Tennessee 38119.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members exceeds 100, many of whom have different

citizenship from Defendant, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18.     This Court has personal jurisdiction over Defendant because they operate and are headquartered in this District and conduct substantial business in this District.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is based in this District, maintain Plaintiff's and Class Members' Private Information in this District, and have caused harm to Plaintiff and Class Members in this District.

## FACTUAL ALLEGATIONS

### A. Defendant Knew the Risks of Collecting and Storing Valuable PII and the Foreseeable Harms of Data Theft

20.     At all relevant times, Defendant knew they were storing and permitting employees to use network systems to transmit valuable, sensitive PII and that, as a result, Defendant's systems would be attractive targets for cybercriminals.

21.     Defendant required customers to entrust their sensitive PII with Defendant, either directly or indirectly, as a condition of obtaining financial services from Defendant or from Defendant's financial technology partners like Bilt, EarnIn, Stripe, and Plaid. In the ordinary course of their business practices, Defendant collected, stored, maintained, and used PII from each of its customers or its partners' customers, including Plaintiff and Class Members.

22.     The PII that customers entrust with Defendant, directly or indirectly, includes, *inter alia*, Social Security numbers, government document numbers, dates of birth, phone numbers, physical and email addresses, bank account numbers, and payment card information, all of which can be used to commit myriad financial and identity crimes.

5

23.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

24.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[3] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[4]

25.     According to experts, one out of four data breach notification recipients become a victim of identity fraud.

26.     PII is highly valued by criminals, as evidenced by the price that such information commands on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, a single victim's personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[5] Experian reports that a stolen credit or

---

[3] 17 C.F.R. § 248.201 (2013).

[4] *Id.*

[5] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Mar. 25, 2023).

debit card number can sell for $5 to $110 on the dark web.[6] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[7]

27.     While credit and debit card numbers have significant value to cybercriminals, this value is limited—although often significant still—because victims can cancel or close their credit and debit card accounts when they are notified of a breach. Worse still, victims whose static personal information is stolen—like Plaintiff and Class Members victimized by the Data Breach— have no straightforward way of safeguarding themselves against ongoing fraud. A Social Security number is not something that can easily be "cancelled" or "closed."

28.     Accordingly, PII commands a much higher price on the black market than payment card data. As Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[8]

29.     Moreover, there may be a time lag between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[6] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed Mar. 25, 2023).

[7] In the Dark, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Mar. 25, 2023).

[8] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Oct. 4, 2023).

As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[9]

30.    Data theft is not a hypothetical concern; in fact, the rate of cyberattacks has increased dramatically in recent years.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68 percent increase from 2020.[10]

31.    Cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issued a warning to potential targets to be aware of, and prepared for, a potential attack.[11]

32.    Generally, "[c]ybercriminals choose their targets based on two conditions – maximum impact and maximum profit . . . [f]inancial institutions perfectly meet these conditions because they store highly valuable data, and their digital transformation efforts are creating greater opportunities for cyber attackers to access that data."[12]

33.    Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

34.    The development of "Fullz" packages means stolen PII from a data breach can easily be used to link and identify it to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails,

---

[9] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last accessed Aug. 23, 2021).
[10] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[11] FBI, Secret Service Warn of Targeted, Law360 (Nov.18,2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware.
[12] Edward Kost, 10 Biggest Data Breach in Finance [Updated August 2022], UpGuard, (Mar. 2, 2023), https://www.upguard.com/blog/biggest-data-breaches-financial-services.

phone numbers, or credit card numbers is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package and sell it at a higher price, over and over.

35.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[13]

36.     According to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[14]

37.     Victims of identity theft suffer embarrassment, blackmail, or harassment in person or online, and experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

38.     In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims spend considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft must spend time correcting fraudulent information in their credit reports and must continuously monitor their reports for future inaccuracies. They also must close existing bank and credit accounts, open new ones, and often must dispute fraudulent charges with creditors.

39.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use stolen PII. To protect themselves, data breach victims need to remain vigilant against unauthorized data use for years or even decades to come.

40.     According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take significant time, money, and

---

[13] Available at 2019_IC3Report.pdf (last visited Apr. 4, 2023).
[14] *Id.*

patience to resolve the fallout.[15] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

41.     Aside from the risks of identity theft and fraud, PII is also private property that has monetary value to data breach victims.

42.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[16]

43.     In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[17] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[18]

44.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [$2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license

---

[15] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-is-stolen (last visited October 10, 2022).
[16] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.
[17] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, NO. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[18] *Id.* at 25.

number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[19]

45.     In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee-for-services-provided to monetizing their users' data—including user data that is not necessary for product or service, which she refers to as "behavioral surplus."[20]

46.     This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to users. Market exchanges have sprung up where individual users like Plaintiff can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay users for their data.[21] Likewise, apps such as Zynn, a TikTok competitor, pay users to sign up and interact with the app.[22]

47.     There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished when users discover how their data is being covertly intercepted, collected, used, and disclosed.

48.     As Professors Acquisti, Taylor and Wagman relayed in their 2016 article "The Economics of Privacy," published in the Journal of Economic Literature:

> Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, and consumption habits) are increasingly regarded as business assets that can be used to target

---

[19] *Id.*

[20] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

[21] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[22] Jacob Kastrenakes, A New TikTok Clone hit the top of the App Store by Paying users to watch videos, The Verge (May 29, 2020), https://www.theverge.com/2020/5/29/21274994/zynn-tiktokclone-pay-watch-videos-kuaishou-bytedance-rival.

services or offers, provide relevant advertising, or be traded with other parties.[23]

49.     In other words, a successful cyberattack leaves criminals with a lucrative and readily monetized supply of PII—and deprives its victims of the exclusive use of their own information.

50.     The documented increase in cyberattacks, combined with increasing monetary incentives that heighten the risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant, at the time of the Data Breach.

51.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the finance industry preceding the date of the Data Breach.

52.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members, as current and former customers of Defendant or Defendant's financial technology partners, relied on Defendant to keep their PII confidential and secure, to use their information for business purposes only, and to make only authorized disclosure of their information.

53.     By obtaining, collecting, and storing Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known they were responsible for protecting Plaintiff's and Class Members' Private Information from foreseeable risks of disclosure to unauthorized parties. Defendant agreed to and undertook legal duties to securely store and maintain the Private Information of Plaintiff and Class Members.

---

[23] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. OF ECON. LITERATURE 2, 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf.

### B. *Defendant Breached its Duty by Failing to Apply Reasonable Security Safeguards*

54.     Recognizing the risks and costs of cybercriminal activity, government agencies and industry groups have created reasonable data security protocols that organizations should use to safeguard sensitive information from exposure to cybercriminals.

55.     Defendant breached its duty to Plaintiff and Class Members by failing to implement these reasonable protocols.

56.     The FBI recommends several measures for organizations like Defendant to prevent and detect unauthorized cyberattacks, including that they:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[24]

57.     The Microsoft Threat Protection Intelligence Team recommends several measures for organizations like Defendant to prevent and detect unauthorized cyberattacks, including that they:

   a.   Secure internet-facing assets

      i.   Apply latest security updates;

     ii.   Use threat and vulnerability management;

    iii.   Perform regular audit; remove privileged credentials.

---

[24] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 23, 2021).

    b.  Include IT Pros in security discussions

        i.  Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely.

    c.  Build credential hygiene

        i.  Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords.

    d.  Apply principle of least-privilege

        i.  Monitor for adversarial activities;

       ii.  Hunt for brute force attempts;

     iii.  Monitor for cleanup of Event Logs;

     iv.  Analyze logon events[25]

58.    Additionally, the Federal Trade Commission ("FTC") has also promulgated numerous guides for businesses to highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

59.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information they collect and store; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks;

---

[25] *See Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), available at https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Oct. 11, 2023).

understand their network's vulnerabilities; and implement policies to correct any security problems.[26]

60.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

61.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

62.    As described above, experts studying cybersecurity routinely identify companies in the finance industry as being particularly vulnerable to cyberattacks because of the value of the PII they collect and maintain.

63.    Several best practices have been identified that at a minimum should be implemented by service providers like Defendant, including but not limited to: educating all employees; requiring strong passwords; implementing multi-layer security, including firewalls, anti-virus, and antimalware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

---

[26] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

64.     On information and belief, Defendant failed to meet the minimum standards established by some or all of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

65.     The foregoing frameworks provide existing and applicable industry standards in the finance industry, which applied at all relevant times. Defendant failed to comply with these accepted standards, thereby opening the door to the foreseeable risk of a Data Breach.

66.     Because Defendant was storing the PII of Plaintiff and Class Members, Defendant could and should have implemented the reasonable measures outlined above to prevent and detect cyberattacks. Instead, Defendant failed to implement even basic security measures, like password protection, encryption, or multifactor authentication and/or to adequately train its employees on the most basic security practices such as detecting and reporting phishing.

67.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

68.     Defendant was always fully aware of their obligations to protect the PII of their customers or their partners' customers, including Plaintiff's and Class Members. Defendant was also aware of the significant repercussions that would result from their failure to do so.

### C.  *Defendant's Breach of Duty Was the Proximate Cause of the Data Breach*

69.     In or around early February 2024, an intruder gained unauthorized access to Defendant's network. Defendant failed to detect the unauthorized access of its network for more than three months.

70.     Defendant began investigating this intrusion on May 29, 2024.   Defendant discovered that as early as February 9, 2024, an intruder accessed and exfiltrated the PII of over 7.6 million customers.

71.     Despite learning on or before May 29, 2024 that Plaintiff's and Class Members' PII had been stolen, Defendant did not notify Plaintiff and Class Members individually until July 8, 2024 – roughly six weeks later ("July Notice").

72.     The July Notice that Defendant sent to Plaintiff and Class Members reads, in relevant part:

> We are writing to inform you that some of your personal information was recently impacted when Evolve Bank & Trust ("Evolve") was the victim of a cybersecurity attack.
> . . .
>
> **What happened?** On May 29, 2024, Evolve identified that some of its systems were not working properly. While it initially appeared to be a hardware failure, we subsequently learned it was unauthorized activity. Evolve promptly initiated its incident response processes and stopped the attack. No new unauthorized activity on Evolve's systems has been identified since May 31, 2024. An investigation with assistance from a cybersecurity firm was initiated to investigate what happened and what data may have been impacted. Evolve also notified law enforcement and worked to add further protections to harden its systems.[27]

---

[27] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a2e61e38-f78d-403d-9abb-3810771bb5d2.html

73.     Defendant's also published notice of the Data Breach on their website ("Online Notice"). The Online Notice admits that wide swaths of PII for its personal banking customers, customers of its Open Banking partners, and employees was impacted including "names, Social Security numbers, bank account numbers, and contact information."[28]

74.     Neither the July Notice nor the Online Notice explained to Plaintiff and Class Members the reason for the delay in notifying them of the theft of their sensitive PII. Either Defendant's May, 2024 investigation of the Data Breach, which Defendant claims was conducted by cybersecurity specialists, failed to discover that cybercriminals had stolen Social Security and bank account numbers from Defendant's systems; or Defendant actually discovered the theft of payment card information in May, 2024 and failed to notify Plaintiff,  Class Members, government agencies and the public until July 2024.

75.     As a result of Defendant's failure to either discover or notify Plaintiff and Class Members about the scope of the Data Breach, cybercriminals had unfettered access to Plaintiff's and Class Members' PII for at least five months before Plaintiff and Class Members even knew that this sensitive information had been stolen from Defendant's network.

76.     Because Defendant Evolve failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, unauthorized third parties were able to access Defendant's database, and then access and exfiltrate Plaintiff's and Class Members' Private Information stored on Defendant's database.

77.     Defendant Evolve could have prevented the Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiff and Class Members.

---

[28] https://www.getevolved.com/about/news/cybersecurity-incident/

78.     Alternatively, Evolve could have destroyed the data, especially for individuals who had fulfilled their contractual obligations with Defendant and no longer had a business relationship with Defendant.

79.     Defendant could have prevented or mitigated the harm of the Data Breach by monitoring event logs and discovering suspicious activity when it first occurred in February 2024.

80.     Defendant could have mitigated the harm of the Data Breach by timely discovering and reporting the theft of PII, instead of waiting to notify Plaintiff and Class Members until July 2024 – *five months* after the theft had occurred.

81.     Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendant to protect and secure sensitive data they possess. Despite the prevalence of public announcements regarding data breach and data security threats, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

### D. Plaintiff and Class Members Suffered Injury

82.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

83.     The unencrypted Private Information of Plaintiff and Class Members has already been listed for sale on the internet and leaked on the Dark Web.[29]

84.     Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

---

[29] https://techcrunch.com/2024/07/09/evolve-bank-says-ransomware-gang-stole-personal-data-on-millions-of-customers/

85.     Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information. Potential fraudsters can use the Private Information compromised in the Data Breach to more effectively target such schemes to Plaintiff and Class Members.

86.     Plaintiff and Class Members now face years of constantly monitoring their financial and personal records to protect themselves from fraud and identity theft. The Class is incurring and will continue to incur such damages in addition to any economic losses resulting from fraudulent use of their PII.

87.     Defendant's delay in notifying affected persons of the theft of their Private Information prevented early mitigation efforts and compounded the harm.

88.     Plaintiff and Class Members have already suffered or will suffer actual injury as a direct result of the Data Breach. Many victims, including Plaintiff and Class Members, suffered ascertainable losses in the form of out-of-pocket expenses and the value of lost time reasonably incurred to remedy or mitigate the effects of the Data Breach, including:

      a.  Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

      b.  Purchasing credit monitoring and identity theft prevention;

      c.  Placing "freezes" and "alerts" with reporting agencies;

      d.  Spending time on the phone with or at financial institutions and/or government agencies to dispute unauthorized and fraudulent activity in their name;

      e.  Contacting financial institutions and closing or modifying financial accounts; and

      f.  Closely reviewing and monitoring Social Security number, bank accounts, and credit reports for unauthorized activity for years to come.

89.     Moreover, Plaintiff and Class Members have a continuing  interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, ensuring the storage of data or documents containing Private Information is not accessible online and that access to such data is encrypted and password protected.

90.     Upon information and belief, Defendant's systems are still at risk of hacking by unauthorized individuals who may easily access the Private Information of Plaintiff and Class Members.

91.     To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach.

92.     Defendant acknowledges the harm caused to Plaintiff and Class Members because they offer a complimentary 24-month credit monitoring program via Experian IdentityWorks. The 24 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate, as it fails to account for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, if not an ongoing risk for the duration of their lifetime.

93.     Defendant places the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, instead of automatically enrolling all victims of the Data Breach.

94.     As a result of Defendant's failure to prevent—and to timely detect—the Data Breach, Plaintiff and the Class have suffered and will continue to suffer damages, including

monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.   The loss of the opportunity to control how their PII is used;

    b.   The diminution in value of their PII;

    c.   The compromise and continuing publication of their PII;

    d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation of identity theft or fraud;

    e.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.   Delay in receipt of tax refund monies;

    g.   Unauthorized use of stolen PII; and

    h.   The continued risk to their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in their possession.

95.    In addition, the stolen PII may fall into the hands of companies who will use the information for targeted marketing, without obtaining consent from, or providing compensation to, Plaintiff and Class Members.

### E. *Plaintiff Perrier's Experience*

96.    Plaintiff Patrice Perrier is an adult individual and citizen of Maryland, residing in Montgomery County, where she intends to stay. Plaintiff Perrier received a notice letter by email

from Defendant's FinTech partner, Bilt, on June 28, 2024,[30] and a second email on July 12, 2024 from EarnIn, nforming her that her sensitive personal information was potentially compromised. Plaintiff Perrier has yet to receive any notice from Defendant directly.

97.     Plaintiff Perrier is a cautious person and is therefore very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Perrier stores any documents containing her sensitive Private Information in a safe and secure location or they destroy the documents. When it is available to her, Plaintiff Perrier uses two-factor or multifactor authentication to add an extra layer of security to her Private Information.

98.     Defendant obtained Plaintiff Perrier's information indirectly, based on her use of a service offered by two of Defendant's FinTech partners: Bilt and EarnIn. Plaintiff Perrier only allowed Defendant to collect, store, maintain, and use her Private Information because she believed Defendant would use reasonable security measures to protect her Private Information, such as requiring passwords and multifactor authentication to access databases storing her Private Information and adequately training its employees to ensure their ability to avoid phishing scams. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

99.     The instant Plaintiff Perrier's Private Information was accessed and obtained by a third party without their consent or authorization, Plaintiff Perrier suffered injury from a loss of privacy.

---

[30] Plaintiff Perrier's Data Breach Notice, attached herein as Exhibit A. Plaintiff also received a second email informing her of Defendant's Data Breach on Friday July 12, 2024 from EarnIn, another of Defendant's banking partners. This second Data Breach Notice is attached herein as Exhibit B.

100.    Plaintiff Perrier has been further injured by the damages to and diminution in value of her Private Information—a form of intangible property that Plaintiff Perrier entrusted to Defendant indirectly. This information has inherent value that Plaintiff Perrier and Class Members were deprived of when their Private Information was placed on a database vulnerable to cyberattack, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

101.    Plaintiff Perrier's Personal Information has already been leaked on the Dark Web by cybercriminals after Defendant refused to take protectionary measures to regain control of the data from the LockBit cybercriminal gang. The actions of unauthorized criminal third parties have detrimentally impacted Plaintiff's life, and specifically caused great financial strain as a direct result of the Data Breach.

102.    The Data Breach has also caused Plaintiff Perrier to suffer imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals.

103.    In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff and Class Members, the Data Breach has forced Plaintiff and Class Members to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter and self-monitoring their accounts and credit reports for fraudulent activity. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

104.    Defendant acknowledges the risk posed to Plaintiff and her Private Information. Indeed, Defendant offered a 24-month identity theft protection service.

105.    The substantial risk of imminent harm and loss of privacy has caused Plaintiff Perrier to suffer stress, fear, and anxiety.

106.    Plaintiff and Class Members have a continuing interest in ensuring their Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

107.    Plaintiff brings this case as a class action on behalf of her and on behalf of a Nationwide Class ("the Class"), pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure:

**Nationwide Class:** All persons whose Private Information was compromised in the Evolve Data Breach which occurred starting in February 2024.

108.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

109.    Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

110.    The Class satisfies the prerequisites for class certification under Fed. R. Civ. P. 23(a).

111.   <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Defendant has asserted that there are over 7.6 million individuals whose Private Information was improperly accessed in the Data Breach.  The exact size of the Class and the identities and state citizenship of each Class Member is ascertainable from Defendant's records.

112.   <u>Commonality</u>: This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a.   Whether Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b.   Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c.   Whether Defendant breached its duty to safeguard the Private Information of Plaintiff and Class Members;

d.   Whether and when Defendant actually learned of the Data Breach;

e.   Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

f.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

  i. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

  j. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

  k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

113. <u>Typicality:</u> Plaintiff's claims are typical of those of the Class Members she represents.  The claims of the Plaintiff and Class Members are based on the same legal theories and arise from the same failure by Defendant to safeguard PII.  Plaintiff and Class Members were all customers of Defendant (directly or indirectly), each having their PII compromised due to Defendant's conduct.

114. <u>Adequacy of Representation</u>: Plaintiff is an adequate representatives of the Class because her interests do not conflict with the interests of other Class Members; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Class Members' interests will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

115. The Class satisfies the criteria for class certification under Fed. R. Civ. P. 23(b)(3).

116. <u>Predominance</u>: Common questions of law and fact predominate over any questions affecting only individual Class Members.  For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class.  If Defendant breached its common

law and statutory duties to secure PII on its network server, then Plaintiff and each Class Member suffered damages from the exposure of their sensitive personal information in the Data Breach.

117.   <u>Superiority</u>:   Class litigation is the superior method for fair and efficient adjudication of the claims involved.  Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making class action superior to individual action.

118.   <u>Manageability</u>:   Defendant asserts that there are more than 7.6 million individuals whose PII was compromised in the Data Breach.  The claims of Plaintiff and Class Members are substantially identical as explained above.  Thus, even if Class Members had the resources to pursue individual lawsuits, the judicial system does not have the resources to hear them.  Certifying the case as a class action will centralize millions of substantially identical claims in a single proceeding, making a class action the most manageable adjudication method for Plaintiff, Class Members, Defendant, and the judicial system.

119.   The Class satisfies the criteria for class certification under Fed. R. Civ. P. 23(b)(2).

120.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class by collecting, transmitting and storing Class Members' PII without proper data security safeguards, creating actual, imminent, and ongoing threats that Class Members will experience identity theft and fraud.  The common threat to each Class Members can be mitigated by Defendant's implementation of a common set of reasonable data security protocols.  An injunction mandating that Defendant implement appropriate protocols would constitute final injunctive relief appropriate with respect to the Class as a whole.   Defendant's policies and practices challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge to these policies

hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

## CAUSES OF ACTION

### COUNT I
**NEGLIGENCE**

***On Behalf of Plaintiff and the Nationwide Class***

121.    Plaintiff and the Class repeat the facual allegations contained in the foregoing paragraphs as if fully set forth herein.

122.    Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

123.    Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

124.    Plaintiff and Class Members entrusted Defendant with their Private Information.

125.    Plaintiff and Class Members entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

126.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if their Private Information were compromised or wrongfully disclosed.

127.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiff and Class Members involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred

through the criminal acts of a third party. By accepting, storing, and maintaining Plaintiff's and Class Members' Private Information, Defendant undertook a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the Private Information of Plaintiff and Class Members in Defendant's possession was adequately secured and protected.

128.    By accepting, storing, and maintaining Plaintiff's and Class Members' Private Information, Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information they were no longer required to retain pursuant to applicable laws and regulations.

129.    By accepting, storing, and maintaining Plaintiff's and Class Members' Private Information, Defendant also had a duty to implement and maintain procedures to detect and prevent the improper access and misuse of the Private Information of Plaintiff and Class Members.

130.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and Class Members entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

131.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or Class Members.

132.    A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, due to the nature of Defendant's industry, and particularly in light of Defendant's inadequate security practices.

133.    Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and Class Members, the critical importance of providing adequate security of that Private Information, and the necessity of encrypting Private Information stored on Defendant's systems.

134.    Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included their decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiff and Class Members, including basic encryption techniques available to Defendant.

135.    Defendant knew or should have known Plaintiff's and Class Members' Private Information was stored on their database and were or should have been aware of the extreme risks associated with failing to properly safeguard Plaintiff's and Class Members' Private Information.

136.    Despite being aware of the likelihood that Defendant's databases were vulnerable, not secure, and likely to be attacked by cybercriminals, and knowing that its employees were not adequately trained on proper privacy practices, Defendant failed to correct, update, or upgrade their security protections, thus causing the Data Breach.

137.    Plaintiff and Class Members had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

138.    Defendant was in the best position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

139.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

140.    Defendant had a duty to employ proper procedures to prevent the compromise and unauthorized disclosure of Plaintiff's and Class Members' Private Information.

141.    Defendant has admitted that the Private Information of Plaintiff and Class Members was disclosed due to Defendant's technical security configuration issue and an inadequately trained or overseen employee, and thus also accessed and exfiltrated by unauthorized third persons as a result of the Data Breach.

142.    Defendant improperly and inadequately safeguarded the Private Information of Plaintiff and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

143.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiff and Class Members during the time the Private Information was within Defendant's possession or control.

144.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiff and Class Members in the face of increased risk of theft.

145.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Private Information.

146.    Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove Private Information it was no longer required to retain pursuant to regulations.

147.    Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and Class Members the occurrence and scope of the Data Breach.

148.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

149.    Said differently, if Defendant had properly prevented a security vulnerability, then the Data Breach would not have occurred, and Plaintiff's and Class Members' Private Information would have been appropriately safeguarded.

150.    Plaintiff and Class Members suffered an injury when their Private Information was accessed by unknown third parties.

151.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, and increased risk of imminent harm, suffered by Plaintiff and Class Members.

152.    The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

153.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to, the following: (i) actual fraud and identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) loss of productivity and lost opportunity costs associated with addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk and substantially increased risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiff and Class Members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (ix) the diminution in value of Plaintiff's and Class Members' Private Information.

154.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

155.     Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their Private

Information, which upon information and belief remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

156.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT II
## NEGLIGENCE PER SE

### *On Behalf of Plaintiff and the Nationwide Class*

157.    Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

158.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

159.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by failing to comply with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII they collected and stored and the foreseeable consequences and immense damages that would result to Plaintiff and Class Members.

160.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

161.    Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

162.    The harm resulting from the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as

a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

163.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiff and Class Members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

164.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

165.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their

Private Information, which upon information and belief remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession.

166.     As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

<u>**COUNT III**</u>
**BREACH OF IMPLIED CONTRACT**

***On Behalf of Plaintiff and the Nationwide Class***

167.     Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

168.     Plaintiff and Class Members were required to provide Defendant with their Private Information either directly or indirectly.

169.     By Plaintiff and Class Members providing their Private Information, and by Defendant accepting this Private Information, the parties mutually assented to implied contracts. These implied contracts included an implicit agreement and understanding that (1) Defendant would adequately safeguard Plaintiff's and Class Members' Private Information from foreseeable threats, (2) that Defendant would delete the information of Plaintiff and Class Members once they no longer had a legitimate need; and (3) that Defendant would provide Plaintiff and Class Members with notice within a reasonable amount of time after suffering a data breach.

170.     Defendant provided consideration by providing their services, while Plaintiff and Class Members provided consideration by providing valuable property—i.e., their Private Information. Defendant benefitted from the receipt of this Private Information by increasing profit from additional business.

171.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

172.    Defendant materially breached their implied contracts with Plaintiff and Class Members when they (1) placed their Private Information on a publicly available database that could (and later was) accessed by members of the public on the internet without a password or multifactor authentication and (2) waited an unreasonably long time to notify them of the Data Breach. It is common sense that Plaintiff and Class Members would not have provided Defendant with their Private Information had they known that Defendant would not implement basic data security measures or that they would wait several months to notify them of a data breach involving their Private Information.

173.    Defendant's breaches of contract have caused Plaintiff and Class Members to suffer damages from the lost benefit of their bargain, out of pocket monetary losses and expenses, loss of time, and diminution of the value of their Private Information.

174.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

<u>COUNT IV</u>
**UNJUST ENRICHMENT (IN THE ALTERNATIVE)**

*On Behalf of Plaintiff and the Nationwide Class*

175.    Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

176.    This claim is pleaded in the alternative to the breach of implied contractual duty claim above (Count III) and the breach of the covenant of good faith and fair dealing claim below (Count VII).

177.    Plaintiff and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable Private Information.

178.    Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

179.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members suffered as a direct and proximate result of Defendant's failure to provide the requisite data security.

180.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

181.    Defendant acquired the monetary benefit and Private Information of Plaintiff and Class Members through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

182.     If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

183.     Plaintiff and Class Members have no adequate remedy at law.

184.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

185.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

186.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

## <u>COUNT V</u>
## BREACH OF BAILMENT

### *On Behalf of Plaintiff and the Nationwide Class*

187.    Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

188.    Plaintiff's and Class Members' Private Information is personal property.

189.    Plaintiff and Class Members provided Private Information to Defendant, either directly or indirectly, with the sole purpose that Defendant would use the Private Information to enter into mutually beneficial financial services contracts with Plaintiff and Class Members.

190.    Plaintiff and Class Members provided their Private Information to Defendant on the express and implied conditions that Defendant had a duty to keep the Private Information confidential.

191.    Plaintiff's and Class Members' Private Information has value and is highly prized by hackers and criminals.  Defendant was aware of the risks they took when accepting the Private Information for safeguarding and assumed the risk voluntarily.

192.    Once Defendant accepted Plaintiff's and Class Members' Private Information, they were in the exclusive possession of that information, and neither Plaintiff nor Class Members could control that information once it was within the possession, custody, and control of Defendant.

193.    Defendant did not safeguard Plaintiff's or Class Members' Private Information when it failed to adopt and enforce adequate security safeguards to prevent a known risk of a cyberattack.

194.    Defendant's failure to safeguard Plaintiff's and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

195.    As a result of Defendant's failure to keep Plaintiff's and Class Members' Private Information secure, Plaintiff and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—is appropriate.

### COUNT VI
### BREACH OF FIDUCIARY DUTY

#### *On Behalf of Plaintiff and the Nationwide Class*

196.    Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

197.    A confidential relationship existed between Defendant and Plaintiff and Class Members.   Plaintiff and Class Members put their trust in Defendant to protect their Private Information and Defendant accepted that trust.

198.    Defendant breached the fiduciary duty they owed to Plaintiff and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest loyalty, and failing to protect Plaintiff's and Class Members' Private Information.

199.    Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

200.    But for Defendant's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

201.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

202.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and demand actual, consequential, and nominal damages, and injunctive relief.

<u>COUNT VII</u>
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

*On Behalf of Plaintiff and the Nationwide Class*

203.    Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

204.    Every contract in this state has an implied covenant of good faith and fair dealing. This implied covenant is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

205.    While Defendant had discretion in the specifics of how they met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

206.    Defendant breached this implied covenant when it engaged in acts and/or omissions that are declared unfair trade practices by the FTC. These acts and omissions included: failing to protect Plaintiff's and Class Members' Private Information and failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

207.    Plaintiff and Class Members did all or substantially all the significant things that their contracts required them to do. All conditions required for Defendant's performance were met.

208.    Defendant's acts or omissions unfairly interfered with Plaintiff's and Class Members' rights to receive the full benefit of their contracts.

209.    Plaintiff and Class Members have been or will be harmed by Defendant's breach of this implied covenant in the many ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber criminals have obtained their PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

210.     Defendant is liable for their breaches of these implied covenants, whether or not it is found to have breached any specific express contractual term.

211.     Plaintiff and Class Members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## <u>COUNT VIII</u>
## INVASION OF PRIVACY/INTRUSION UPON SECLUSION

### *On Behalf of Plaintiff and the Nationwide Class*

212.     Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

213.     Plaintiff and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

214.     Defendant owed a duty to its customers, partners' customers, and former customers, including Plaintiff and Class Members, to keep their Private Information secure and confidential.

215.     Defendant failed to secure and protect the Private Information of Plaintiff and Class Members from disclosure to unknown and unauthorized third parties.

216.     By failing to protect Plaintiff's and Class Members' Private Information, Defendant allowed unauthorized and unknown third parties to access the Private Information of Plaintiff and Class Members.

217.     The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiff and Class Members is highly offensive to a reasonable person.

218.     Defendant invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

219.     The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members entrusted their Private Information to Defendant as a prerequisite to their use of Defendant's services, but they did so privately with the intention that their Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that their Private Information would be kept private and would not be disclosed without their authorization.

220.     Defendant's inadequate data security practices and the resulting Data Breach constitute intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

221.     Defendant acted with a knowing state of mind when they permitted the Data Breach to occur because it knew or should have known that its data security practices were inadequate and insufficient.

222.     Because Defendant acted with this knowing state of mind, it had notice and knew its inadequate and insufficient data security practices would cause injury and harm to Plaintiff and Class Members.

223.     By intentionally failing to keep Plaintiff's and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and,

c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

224.    Defendant knew that an ordinary person in Plaintiff's or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

225.    As a proximate result of the above acts and omissions of Defendant, the Private Information of Plaintiff and Class Members was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer damages.

226.    The acts complained of herein are ongoing and/or have a substantial likelihood of being repeated.

227.    Defendant's unlawful invasions of privacy damaged Plaintiff and Class Members. As a direct and proximate result of Defendant's unlawful invasions of privacy, Plaintiff and Class Members suffered mental distress, and their reasonable expectations of privacy were frustrated and defeated. Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial and/or injunctive relief.

## COUNT IX
## DECLARATORY AND INJUNCTIVE RELIEF

### *On Behalf of Plaintiff and the Nationwide Class*

228.    Plaintiff and the Class repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

229.    Plaintiff pursues this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

230.    Defendant owes a duty of care to Plaintiff and Class Members that require them to adequately secure Plaintiff's and Class Members' Private Information.

231.    Defendant failed to fulfill their duty of care to safeguard Plaintiff's and Class Members' Private Information.

232.    As described above, actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendant's failure to address the security failings that led to such exposure.

233.    There is no reason to believe that Defendant's employee training and security measures are any more adequate now than they were before the breach to meet Defendant's contractual obligations and legal duties.

234.    Plaintiff and the Class, therefore, seek a declaration (1) that Defendant's existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security, and (2) that to comply with their contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to, the following:

a.  Ordering that Defendant engage internal security personnel to conduct testing, including audits of Defendant's systems, on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such internal security auditors;

b.  Ordering that Defendant engage third-party security auditors to run automated security monitoring;

c.  Ordering that Defendant audit, test, and train their security personnel and employees regarding any new or modified data security policies and procedures;

d.  Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for their provision of services;

e.  Ordering that Defendant conduct regular database scanning and security checks; and

f.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, Plaintiff and Class Members' Personally Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.  Certify this case as a Class Action pursuant to Federal Rule of Civil Procedure 23;

B.  Order appropriate compensatory, injunctive, equitable, declaratory, punitive, and nominal relief to Plaintiff and Class Members under the applicable law;

C.  Award Plaintiff an appropriate Class Representative Service Award for her prosecution of this matter on behalf of all Class Members;

D.  Award Plaintiff and the Class pre-judgment and/or post-judgment interest as prescribed by law; and

E.  Enter other and further such relief as the Court deems to be both just and fair.

## DEMAND FOR JURY TRIAL

A jury trial is demanded on all claims so triable.

Dated: July 18, 2024

Respectfully submitted,

*/s/William F. Burns*
William F. Burns (TN Bar #17908)
Frank L. Watson, III (TN Bar #01573)
William E. Routt, III (TN Bar #28577)
**Watson Burns, PLLC**
5865 Ridgeway Center Pkwy.
Suite 300
Memphis, TN 38120
Phone: (901) 529-7996
bburns@watsonburns.com
fwatson@watsonburns.com
wroutt@watsonburns.com


James J. Pizzirusso*
Amanda V. Boltax*
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
Tel.: (202) 540-7200
Fax: (202) 540-7201
Email: jpizzirusso@hausfeld.com
Email: mboltax@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
Tel.: (646) 357-1100
Fax: (212) 202-4322
Email: snathan@hausfeld.com

*Counsel for Plaintiff*

***Pro Hac Vice Forthcoming***

50